```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF NEW YORK
 2

 3    --------------------------------X
                                      :
 4    DAVID HEARD,                    :
                                      : 16-CV-01079 (ALC)
 5                  Plaintiff,        :
                                      :
 6              v.                    : March 5, 2019
                                      :
 7    STATUE CRUISES LLC,             : 500 Pearl Street
                                      : New York, New York
 8                  Defendant.        :
      --------------------------------X
 9
              TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
10            BEFORE THE HONORABLE BARBARA C. MOSES
                   UNITED STATES MAGISTRATE JUDGE
11

12    APPEARANCES:

13    For the Plaintiff:       WILLIAM B. WACHTEL, ESQ.
                               SARA G. SPIEGELMAN, ESQ.
14                             Wachtel & Missry, LLP
                               New York, New York 10017
15
      For the Defendant:       JENNIFER M. SCHMALZ, ESQ.
16                             Kane Kessler, PC
                               666 Third Avenue
17                             New York, New York 10017

18                             STEVEN E. BERS, ESQ.
                               Whiteford Taylor Preston, LLP
19                             7 Saint Paul Street
                               Baltimore, Maryland 21202
20

21
      Court Transcriber:       MARY GRECO
22                             TypeWrite Word Processing Service
                               211 N. Milton Road
23                             Saratoga Springs, New York 12866

24

25


      Proceedings recorded by electronic sound recording,
      transcript produced by transcription service
```

2

1          THE CLERK:  <u>David Heard v. Statue Cruises, LLC</u>.

2          Counsel, state your appearance for the record.

3          MR. WACHTEL:  Good morning, Your Honor.  My name is

4   William Wachtel.  I'm here with my partner, Sara Spiegelman

5   and we're here on behalf of the plaintiff, David Heard.

6          THE COURT:  Good morning.  Be seated.

7          MS. SCHMALZ:  Good morning, Your Honor.  My name is

8   Jennifer Schmalz and I'm with Kane Kessler.  I'm here on

9   behalf of Statue Cruises and I'm here with my co-counsel from

10  Baltimore, Maryland.

11         MR. BERS:  Steven Bers from the firm of Whiteford

12  Taylor Preston, Your Honor.

13         THE COURT:  Good morning, counsel.  Be seated.

14         First let me make sure I understand the status of

15  the expert discovery.  I ordered the parties to get it done by

16  March the 1st.  I did that on January the 23rd.  I said, quote,

17  no further extensions will be granted period, close quote.  I

18  reiterated that deadline last week in the midst of the current

19  discovery controversy and yet if I am reading the plaintiff's

20  reply letter correctly, plaintiff's February 26th reply letter,

21  the parties took it upon themselves to schedule two of the

22  three expert depositions beyond March the 1st that requesting

23  Court permission.  Who's issue is this for the plaintiff?

24         MS. SPIEGELMAN:  Good morning, Your Honor.  Sara

25  Spiegelman.

3

1   THE COURT:  Ms. Spiegelman, did I miss anything?

2   MS. SPIEGELMAN:  Well, we requested that the Court

3   allow these two additional depositions to go forward after the

4   deadline.

5   THE COURT:  You requested that only in your reply

6   letter after having scheduled it without asking my permission,

7   correct?

8   MS. SPIEGELMAN:  Correct.  Based upon the

9   unavailability of one of the experts for defendant and one of

10   the experts for plaintiff.

11   THE COURT:  Right.  And what did I last say about

12   that?

13   MS. SPIEGELMAN:  We understand your order, Your

14   Honor, and we understand that depositions of experts should

15   have been completed by March 1st.

16   THE COURT:  And I take it your expert whose name is

17   what?

18   MS. SPIEGELMAN:  Peggy Greenwell.

19   THE COURT:  Greenwell, has not yet been deposed?

20   MS. SPIEGELMAN:  She has not.

21   THE COURT:  And when did you find out that she

22   couldn't be deposed by the deadline I set?

23   MS. SPIEGELMAN:  Well, she initially was scheduled

24   to be deposed on February 22nd.  And when we discovered this

25   issue, we felt as though --

4

1          THE COURT:  You pulled her.

2          MS. SPIEGELMAN:  -- we should go before the Court --

3          THE COURT:  You pulled her, correct?

4          MS. SPIEGELMAN:  Correct.

5          THE COURT:  And didn't ask me for permission to

6    extend past March the 1st.  You just pulled her unilaterally.

7    And now you want me to default the defendants for not

8    producing documents timely.

9          MS. SPIEGELMAN:  Well, the reason why I didn't want

10   depositions to go forward was because this litigation has been

11   hamstrung from the beginning because we've been required to

12   take depositions without all the necessary documents.  So I

13   thought that it was prudent to go before the Court and get a

14   ruling on what documents had to be produced.  My expert was

15   not able to review the proposals that were belatedly produced

16   in connection with her expert report.

17         THE COURT:  And where in your moving letter dated

18   February 15th do you advise me that you were planning to blow

19   that deadline.

20         MS. SPIEGELMAN:  I did not advise the Court that I

21   was planning to blow that deadline.  But I thought that it was

22   prudent --

23         THE COURT:  The defendant had to tell me that in

24   their responding letter, correct?

25         MS. SPIEGELMAN:  Correct.  Once again, I apologize.

5

1   I thought that it would be the most prudent course of action

2   to get before the Court and understand these --

3            THE COURT:  The most prudent course of action is

4   always to advise the judge in advance if you can't or don't

5   think you should be required to comply with the court order

6   particularly one that's been issued in no uncertain terms.  No

7   further extensions will be granted, period, is fairly clear I

8   thought.

9            MS. SPIEGELMAN:  I understand, Your Honor, and I

10  apologize for that.

11           THE COURT:  All right.  Let me hear from the

12  defendant as to whether there's any good faith argument that

13  the two McLaren proposals -- I understand that they appear to

14  be two versions of the same proposal but they were issued on

15  two different dates and they are different.  Is there any good

16  faith argument that these documents are not within the scope

17  of request number 14?  Because it seems pretty clear to me.

18           MS. SCHMALZ:  Yes, Your Honor.  They were not within

19  the scope of request number 14.  These -- we actually took

20  the, the plaintiffs took the deposition last week, last

21  Thursday of Malcolm McLaren who is the CEO of McLaren

22  Engineering and he's actually the gentleman who created and

23  produced this proposal.  And Mr. McLaren was repeatedly asked

24  multiple questions about this proposal.  Your Honor, if I

25  could, I wish I had the transcript from that deposition.  It's

6

 1  not going to be available till this Thursday.  And I would

 2  like permission to submit that to the Court.

 3          THE COURT:  Why don't you summarize it for me?

 4          MS. SCHMALZ:  Okay.  Absolutely.  So Mr. McLaren

 5  testified that this proposal was solicited five years ago from

 6  Statue Cruises for the purpose of considering a response.

 7  What was happening, Your Honor, is they had had employees who

 8  were carrying the gangplanks on and off the vessels and who

 9  were sustaining injuries and then filing worker's compensation

10  types of claims.

11          THE COURT:  So they wanted better mechanical

12  gangways?

13          MS. SCHMALZ:  No, they did not.  They wanted Mr.

14  McLaren, who is an expert on vessels and engineering, to lay

15  out a proposal of what would it cost for us to, for you to

16  inspect and consider options related to the gangways that

17  would address the concern regarding the injuries and

18  prospective injuries to our employees?  And this proposal, as

19  Mr. McLaren explains very clearly in his deposition, is just

20  that.  It is not a plan.  It does not render any advice

21  related to accessibility.  He said there was -- the only

22  comment in this entire proposal, Your Honor -- and again, Mr.

23  McLaren explained this is phases that they would have

24  undertaken if this proposal was accepted by Statue Cruises

25  which it never was.  And Mr. McLaren explained that the --

1          THE COURT:  Right.  But just to stop you there.  I

2 understand, you said it in your letter so I'm not surprised to

3 hear that the testimony is consistent, that the proposal was

4 never accepted and the project never went forward.  But

5 request number 14 didn't ask about completed work, it asked

6 about quote proposals, close quote.

7          MS. SCHMALZ:  It did.  But it asked, Your Honor,

8 about proposals related to accessibility for disabled persons.

9          THE COURT:  Correct.

10          MS. SCHMALZ:  And Mr. McLaren repeatedly testified

11 that this proposal did not relate to accessibility for

12 disabled persons.  He didn't consider it and --

13          THE COURT:  Well, let me --

14          MS. SCHMALZ:  I'm sorry.

15          THE COURT:  -- let me just again stop you there.  I

16 understand you are telling me that that wasn't the motivating

17 factor, that the purpose of the request and the purpose of the

18 proposal wasn't first and foremost to improve accessibility

19 for handicapped persons, persons with disabilities.  But I

20 don't read request number 14 quite so narrowly.  Requests in

21 discovery are to be read reasonably.  And reading request

22 number 14 reasonably, I find it hard to say, hard to conclude

23 that a proposal dated January 14, 2014, which includes on Page

24 1 as part of the proposal that we will seek an opinion from

25 attorneys on the need for ADA compliance of gangways shouldn't

8

1   have been produced.  It would have saved you a lot of trouble.

2        MS. SCHMALZ:  Well, Your Honor, again, this proposal

3   -- I do want to point out that this proposal was requested

4   from us during that January 15th settlement meeting and --

5        THE COURT:  That's what eventually you turned it

6   over.

7        MS. SCHMALZ:  And as you can see, it's Bates stamped

8   and I absolutely did produce the proposal but I --

9        THE COURT:  Right.  But the question is should it

10  have been produced a year ago?

11       MS. SCHMALZ:  Your Honor, I would argue it should

12  not because the reason -- Mr. McLaren also testified that the

13  reason he wrote opinion from attorney on need for ADA

14  compliance of gangways which is the only mention in this

15  entire document related to anything ADA or accessibility is --

16       THE COURT:  Right.  You agree with me that the

17  gangways are part of the Capital F facilities, right?

18       MS. SCHMALZ:  I do.

19       THE COURT:  That's not the problem.

20       MS. SCHMALZ:  They're part of the vessels.  They

21  come on and off the vessels.  They're not attached.  But

22  absolutely, Your Honor.  But what he explained was is there is

23  a local law 68 here that applies in New York that applies only

24  to commuter vessels.  And commuter vessels are required to

25  apply with Local Law 68 which is very similar in terms of

9

1  slopes and requirements related to ADA.  It says land based

2  accessibility.  But Statue Cruises is not a commuter vessel.

3  And it was Mr. McLaren's opinion as he testified that Statue

4  Cruises is not required to comply with Local Law 68.  He

5  testified to all this, Your Honor, that Statute Cruises is not

6  required to comply with Local Law 68 just like they're not

7  required to comply with ADA land based requirements.  They are

8  required to comply with ADA as he testified.  But what he --

9           THE COURT:  Which is presumably why --

10          MS. SCHMALZ:  I'm sorry.

11          THE COURT:  -- on the first page of the January 14th

12  proposal it says ADA.

13          MS. SCHMALZ:  What he says was I need an opinion

14  from an ADA expert attorney because I'm not one on whether or

15  not we even need to comply with the ADA because his

16  understanding as he stated in the deposition was there was no

17  need to consider compliance with the ADA or Local Law 68

18  because it wasn't a commuter ferry.  But he wanted to double

19  check with counsel to find out.  But Your Honor, this piece of

20  paper that has surveys of vessels and [indiscernible] and

21  agency approval and survey sites, this proposal, construction

22  administration, construction documents, none of that has to do

23  with access for the disabled.  This doesn't render a single

24  opinion.  It basically tells Statue Cruises that for $65 to

25  $125,000 --

10

1         THE COURT:  Later reduced to $40,000.

2         MS. SCHMALZ:  Right.  That McLaren would undertake

3    putting together --

4         THE COURT:  To study this.

5         MS. SCHMALZ:  -- just the documentation, Your Honor.

6    That's not even building anything, as Mr. McLaren explained.

7    That's just putting together an engineering proposal.  Now, I

8    admit that if they had gone forward with this proposal and

9    actually produced a report on accessibility, I would

10   absolutely agree that that report would be, or on

11   construction, that report might have been relevant.  But this

12   was a proposal, a cost proposal.  Here's what it would cost us

13   if you want us to do this, if you want us to undertake these

14   steps.

15        THE COURT:  See, here's the problem you have.

16   You're essentially arguing to me that this is not, as my

17   teenager would say, a big whoop.  And you may be right.  It

18   may not in the scheme of things be as breathtaking a document

19   as plaintiff would have me believe.  It may not be a big

20   whoop.  But that's not the test on discovery.  The test is

21   does it reasonably fall within the contours of request number

22   14 which you didn't object to on relevance or over breadth

23   grounds.  And it says proposal on it and it says ADA on it and

24   in my mind should have been produced.  And then we would have

25   found out a year ago if it was a big whoop.

1          MS. SCHMALZ:  Okay.  I apologize but I do want to

2    point out that when we responded on request number 14, which

3    is the third exhibit, we did object to it being overly broad

4    in time and scope, burdensome, et cetera.

5          THE COURT:  Sure.  But you understand the way Rule

6    30 --

7          MS. SCHMALZ:  I understand what you're saying.  I

8    just want to make sure you --

9          THE COURT:  No, this is a different point.  I

10   apologize for interrupting you.  One of the privileges of

11   being a judge is I get to interrupt you but you don't actually

12   get to interrupt me.

13         MS. SCHMALZ:  I understand.

14         THE COURT:  It's unfair but there it is.  Under Rule

15   34, since it was amended in 2015 I think, the treatment of

16   quote general objections close quote is fairly clear.  You are

17   required to state specifically in your response whether you

18   are withholding documents on relevance grounds or not.  And if

19   you simply make a general throat clearing objection, which we

20   all were trained to do in the '80s and the '90s and maybe you

21   weren't trained in the '80s but I was.

22         MS. SCHMALZ:  I was.

23         THE COURT:  And all the way up until 2015, you were,

24   and all the way up until 2015 we used to just recite all of

25   those objections and then we used to say subject to and

1  notwithstanding we have documents or we don't have documents

2  or we'll produce documents next month.  Can't do that anymore.

3  If you're going to be withholding otherwise responsive

4  documents on the basis of the objection that you make, you

5  actually have to say that.  So under Rule 34 as is currently

6  written, I read your response to Number 14 as saying anything

7  we had we would produce, but we don't have anything which

8  falls within the contours of this request.  And I'm not sure

9  that was quite true because I think this does.

10          MS. SCHMALZ:  Okay, Your Honor.  Well, I think if it

11  peripherally has one line that mentions the ADA, it doesn't

12  render any opinion, it doesn't provide any thoughts on how to

13  improve the slope or how to improve the accessibility for

14  persons with disabilities --

15          THE COURT:  That goes to the big whoop issue --

16          MS. SCHMALZ:  Right.

17          THE COURT:  -- not the should it have been produced

18  issue.

19          MS. SCHMALZ:  Exactly.  And I would like to just

20  make one, two more quick points is that, you know, I received

21  an email from Ms. Spiegelman on January 29th where she said to

22  me, you know, asked me about the proposal and said please

23  provide a copy of it by 2/5 so we can use it at the

24  depositions.  And I did in fact on 2/8, a few days later, I

25  provided the Bates stamped copy.  It was available for Mr.

13

1   McLaren's deposition.

2           THE COURT:  And it was used during Mr. McLaren's

3   deposition.  And I assume the plaintiffs spent a fair amount

4   of time on it.

5           MS. SCHMALZ:  Right.  And I also don't know how this

6   document and its production quite honestly justifies them not

7   producing their witness on the 22nd as required.

8           THE COURT:  I'll get to that in a moment.

9           MS. SCHMALZ:  So that's -- so I understand your

10  point, Your Honor.  And I will say also that certainly if this

11  was not produced, it was absolutely not done bad faith.  We

12  produced hundreds of emails, hundreds of documents to

13  plaintiffs so far in this lawsuit which has now gone on as you

14  know for almost three years.  And we have abided by our

15  discovery obligations, you know, certainly in good faith.

16          THE COURT:  Now, your witness, your other witness

17  also has not yet testified, correct?

18          MS. SCHMALZ:  Correct.  He's testifying tomorrow.

19          THE COURT:  Tomorrow.

20          MS. SCHMALZ:  And I thought -- I'm sorry, Your

21  Honor.

22          THE COURT:  All right.  Has the plaintiff formally

23  requested from you any follow-up documents regarding what came

24  to me as Exhibit D?  That is the McLaren proposal.  They say

25  in their motion papers, for example, that they want all of the

1  correspondence between defendant and McLaren with regard to

2  these proposals.

3          MS. SCHMALZ:  During the deposition of Mr. McLaren,

4  Ms. Spiegelman did make some requests which she indicated to

5  me that she was going to put in writing.  Now, I do just want

6  to point out that those documents that she requested which

7  were correspondence that are in the possession and control of

8  Mr. McLaren are not something in my client's possession or

9  control.  They're at McLaren Engineering.

10          THE COURT:  But isn't he your retained expert?

11          MS. SCHMALZ:  He is.  And I can access them.  But I

12  just want to explain that those are also never produced

13  because they are not -- these are not Statue Cruises'

14  documents.

15          THE COURT:  Well, communications --

16          MS. SCHMALZ:  These are in a file at McLaren

17  Engineering.  And absolutely they are --

18          THE COURT:  Counsel.

19          MS. SCHMALZ:  -- to the extent --

20          THE COURT:  Counsel.

21          MS. SCHMALZ:  I'm sorry.

22          THE COURT:  Communications between Statue Cruises

23  and McLaren would be within Statue Cruises' possession,

24  correct?  Emails for example.

25          MS. SCHMALZ:  Emails, yes, absolutely.  Emails

15

1  between Statue Cruises and -- and we did produce a number of

2  emails, Your Honor.  I'm talking about Mr. McLaren testified

3  that he has, like most engineering firms, a folder.  It's

4  labeled, it's got this proposal number 140018 on it.  It's

5  back at McLaren Engineering in his office.  And some of the

6  documents that he testified to at his deposition are things

7  that reside in that folder there --

8            THE COURT:  Okay.

9            MS. SCHMALZ:  -- which I have honestly never seen

10 myself but --

11           THE COURT:  So that then raises a related question

12 which is not briefed in the parties' letter briefs, but I will

13 post to you should Mr. McLaren's prior work of an arguably

14 related nature for your client on the facilities have been

15 produced as part of expert discovery, never mind whether it

16 was responsive to document request number 14.

17           MS. SCHMALZ:  Your Honor, Mr. --

18           THE COURT:  I mean typically a retained expert, not

19 always, but typically a retained expert was previously a

20 stranger, and they come in as a hired gun.  Your guy has

21 history with you.

22           MS. SCHMALZ:  He does have history with Statue

23 Cruises.  That's absolutely correct.  He has testified that

24 he, and as Mike Burke testified, McLaren Engineering has never

25 done an accessibility assessment of the battery or the vessels

1  for purposes of ADA compliance.  So that does not exist.  And

2  we did look to see if there was anything -- I mean, Your

3  Honor, honestly, McLaren Engineering has done a lot of

4  proposals, a lot of work over the years which he testified to

5  during his deposition for all -- you know, throughout the

6  waterfront for Statue Cruises, for other -- I mean it's a huge

7  operation and he's probably honestly one of the most active

8  engineering companies there.  But in terms of producing

9  anything else, I can tell you that he testified under oath

10  that there is no accessibility report that exists that he was

11  retained to produce.

12         THE COURT:  And this particular proposal, the one

13  relating to the land-based gangways, never went anywhere?

14         MS. SCHMALZ:  No, it does not -- this went nowhere.

15  It was rejected by Statue Cruises both times actually.  The

16  first proposal and second proposal were both rejected.

17         THE COURT:  Okay.

18         MS. SCHMALZ:  And for cost reasons.

19         THE COURT:  All right.  Thank you very much.  Let me

20  turn back to plaintiff's counsel.  Now, it's your motion and

21  you have sought terminating sanctions.  As you undoubtedly

22  know, there are a number of sources of my authority to issue

23  sanctions if I conclude, as I am leaning towards, that these

24  two documents should have been produced in response to request

25  number 14.  Under Rule 37(a) I can ship the cost of making a

17

1  motion to compel but strictly speaking this wasn't a motion to
2  compel because you already had the documents.  Under Rule
3  37(b), I can impose a variety of sanctions for violating a
4  prior discovery order but there was no prior discovery order
5  governing request number 14.  Under Rule 37(c) I can impose a
6  variety of discovery sanctions, the same range that I could
7  have imposed under 37(b).  If a party fails to disclose
8  documents in a timely manner pursuant to either Rule 27(a)
9  automatic disclosure, or Rule 26(e) -- 26(a), excuse me, or
10 Rule 26(e) which has to do with supplementing prior responses.
11 37(c), as you may know, has become sort of the workhorse
12 sanctions provision in a situation like this where something
13 arguably should have been produced a year ago and wasn't then
14 and wasn't the month after and wasn't the month after that,
15 and wasn't until somebody stumbled across it or asked the
16 right questions and it was produced.  I also of course have a
17 certain degree of inherent authority that I probably wouldn't
18 need to reach in this situation.  The range of sanctions that
19 I in theory could impose is broad running from cost shifting
20 all the way up to terminating sanctions and/or contempt.  At
21 that end of the scale as something that would strike an answer
22 or enter a default judgment or enter a contempt order would
23 have to be recommended by me to the district judge rather than
24 imposed by me as an order.  I don't think we're going to get
25 there today because the Court's preference, mine, the district

18

1    judge's, the Second Circuit's under the Rule 37 scheme is

2    always to determine disputes on the merits if possible and to

3    impose the sanction, the mildest sanction which accomplishes

4    the goals of Rule 37.  And those goals generally speaking are

5    to cure any prejudice caused by the discovery violation and to

6    serve as a deterrent against future discovery misconduct

7    either specifically in this case or more generally.  I don't

8    think we're really anywhere near terminating sanctions here.

9    So why don't you tell me what in your view would be

10   appropriate to cure the prejudice that you have experienced

11   from not having these two documents last year?

12           MR. WACHTEL:  Thank you, Your Honor.

13           THE COURT:  Okay.  Sorry, that's Mr. Wachtel.  I was

14   looking at Ms. Spiegelman.

15           MR. WACHTEL:  Yes, Your Honor.  In an effort to be

16   highly practical, I guess what we really want to do is get

17   this case tried and done with is what we would request of the

18   Court is that McLaren and Statue Cruises be required to

19   produce any and all relevant documents, communications

20   concerning the work done by McLaren which would include

21   photographs which I believe McLaren did take.

22           THE COURT:  When you say work done by McLaren --

23           MR. WACHTEL:  Oh, in connection with these two

24   proposals.  There was a proposal and a revised proposal.  We

25   believe there's a fair amount of communication back and forth

1  between McLaren and Statue Cruises and we believe there's a

2  fair amount of work product within the custody and control of

3  McLaren including photographs and notes and draft reports.

4           THE COURT:  All right.

5           MR. WACHTEL:  And we believe that we should be

6  entitled to take the deposition of Mr. James Silechia [Ph.]

7  who was the recipient of the report.  I believe --

8           THE COURT:  Who is he exactly?

9           MR. WACHTEL:  I believe he's the chief engineer of

10 the director of operations and is someone who I believe has

11 quite a bit of familiarity with the very issues at the core of

12 this case.

13          THE COURT:  All right.  You've already questioned

14 Mr. McLaren himself about this, right?

15          MR. WACHTEL:  We questioned Mr. McLaren.  Mr.

16 McLaren took a pretty strong position as to what this was so I

17 don't think we need to spend too much more time with Mr.

18 McLaren.  I believe Mr. Silechia's deposition could --

19 certainly won't take more than four or five hours.  I mean

20 it's not going to be difficult.

21          THE COURT:  Is Mr. Silechia still working for Statue

22 Cruises?

23          MS. SCHMALZ:  Yes, Your Honor.

24          THE COURT:  And what did you say he was?  Chief

25 engineer?

1        MS. SCHMALZ:  I apologize, I'm not sure if his exact

2  title but he is in engineering and operations.

3        THE COURT:  Yes.  It doesn't have his title on the

4  proposals.

5        MS. SCHMALZ:  It was a few years ago, Your Honor.

6        THE COURT:  Right.  Jay Silechia at -- are you

7  hornblower.com?  Is that your client's email?

8        MS. SCHMALZ:  That's the parent company, Your Honor.

9        THE COURT:  That's the parent company.  Okay.  All

10  right.  So you want to take Mr. Silechia's deposition for

11  approximately a half a day and you want the defendant and the

12  McLaren firm to produce all of their communications concerning

13  the two versions of the proposal attached at Exhibit D to your

14  February 15th letter and the subject matter of those proposals.

15        MR. WACHTEL:  And maybe photographs and other work

16  product in the possession of McLaren that would give further

17  insight.

18        THE COURT:  So communications and McLaren work

19  product.

20        MR. WACHTEL:  Yes, Your Honor.

21        THE COURT:  Which may include photographs.

22        MR. WACHTEL:  Yes, Your Honor.

23        THE COURT:  All right.  And you think there are

24  photographs because you think they actually did do some

25  preliminary work on these proposals?

21

1           MR. WACHTEL:  Very much so, Your Honor.

2           THE COURT:  Okay.  Did Mr. McLaren tell you there

3   were photos?

4           MR. WACHTEL:  No, Your Honor.

5           THE COURT:  So why do you think there are photos?

6           MR. WACHTEL:  Because we've had the benefit of

7   insights going back many years from someone who worked at

8   McLaren.

9           THE COURT:  Ah, you have a mole.

10           MR. WACHTEL:  I wouldn't say a mole.  I'd say a

11   responsible citizen who before we commenced the lawsuit we

12   spoke to.

13           THE COURT:  All right.  And is that person one of

14   your witnesses?

15           MR. WACHTEL:  At trial he will be.

16           THE COURT:  Has he been disclosed?  He or she?

17           MR. WACHTEL:  I don't think so.

18           THE COURT:  Did you serve Rule 26(a) automatic

19   disclosures here?

20           MS. SCHMALZ:  Late -- they did in March of this year

21   and he was not among the --

22           THE COURT:  Who is this witness?

23           MR. WACHTEL:  What is his name?

24           THE COURT:  Yes, please.

25           MR. WACHTEL:  His name is Shea Thorvaldsen.

22

1          THE COURT:  Spell the last name, please.

2          MR. WACHTEL:  T-H-O-R-V-A-L-D-S-E-N.

3          THE COURT:  Thorvaldsen.

4          MR. WACHTEL:  Thorvaldsen.  It was 26(a)?

5          THE COURT:  All right.  Now, I have not heard anyone

6  say that they need to update or re-depose any experts.  Speak

7  now, plaintiff, then defendant, or forever hold your peace.

8          MR. WACHTEL:  No, Your Honor.

9          MS. SCHMALZ:  I apologize, Your Honor.  You mean

10 aside from obviously the depositions we're going to conduct

11 going forward?

12         THE COURT:  Correct.  But in other words, if I were

13 to order some additional discovery here including Silechia

14 and/or this document discovery, we wouldn't need to further

15 hold up the currently late scheduled expert dispositions for

16 that.  Is that correct from your point of view, Mr. Wachtel?

17         MR. WACHTEL:  Correct, Your Honor.

18         THE COURT:  Okay.  And Ms. Schmalz?

19         MS. SCHMALZ:  That's correct.  And Your Honor, could

20 I make one statement --

21         THE COURT:  Sure.

22         MS. SCHMALZ:  -- regarding Mr. Thorenson?  Mr.

23 Thorenson --

24         THE COURT:  Thorenson?  I'm sorry, I --

25         MS. SCHMALZ:  Shea Thorenson.

1          THE COURT:  Thorenson?

2          MS. SCHMALZ:  Yes.  Mr. Thorenson was employed by

3     McLaren Engineering at the time that McLaren was retained as

4     an expert in this case.  He actually attended the inspection,

5     the first inspection, that Mr. McLaren went on of the vessels

6     as our expert in the case.  He was subsequently let go from

7     McLaren Engineering and went off I believe to start his own

8     engineering firm, other employment.  But he was -- he has been

9     privy to documents and information of our expert and now that

10    he has left the firm, he has had communications with the

11    plaintiff's counsel that I find highly inappropriate

12    considering the fact that he was, I'm sorry, he was retained

13    as part of McLaren Engineering and participated, he had lunch

14    with Mr. Bers at the start of this litigation.

15         THE COURT:  But there's no attorney-client privilege

16    between you and your testifying expert.

17         MS. SCHMALZ:  Well, actually our firm retained our

18    expert and there actually is attorney-client privilege between

19    our law firm and Mr. McLaren.  And this is one of his -- this

20    is a person who had intimate knowledge and was involved as our

21    expert and then after he was terminated, he had conversations

22    with opposing counsel regarding our expert reports,

23    regarding -- I don't even know which conversations, I don't

24    even know the sum and substance, but it --

25         THE COURT:  Ms. Schmalz, are you just finding this

24

1   out today or did you already know this or a part of this?

2          MS. SCHMALZ:  I did not know this.  And honestly,

3   Your Honor, I'd did know that Mr. Thorenson had been let go

4   from McLaren.  And Mr. McLaren advised me of that.  And at the

5   deposition yesterday of Mr. McLaren, Ms. Spiegelman asked Mr.

6   McLaren for Mr. Thorenson's phone number as if she had no idea

7   how to locate him or where he was.  And Mr. McLaren said why

8   don't you ask Mr. Wachtel?  Because Mr. McLaren was aware of

9   the fact that Mr. Wachtel had been having communications with

10  Mr. Thorenson.  So I am now as of, I am definitely now as of

11  the deposition aware of this.  I find it incredibly

12  inappropriate that Mr. Wachtel is having conversations with

13  someone who served as our expert in -- well, worked for our

14  expert in this litigation.

15         THE COURT:  So you're using general words like

16  inappropriate.  Can you sharpen that up for me?  What rule,

17  principle, statute, contract --

18         MS. SCHMALZ:  Well certainly, Your Honor, there --

19         THE COURT:  -- has been violated here in your view?

20         MS. SCHMALZ:  Well, we do have -- it is my position

21  that we do have an attorney-client privilege with the expert

22  because he was retained by my law firm to serve as an expert.

23  McLaren was retained --

24         THE COURT:  But he's not your client.  That's not an

25  attorney-client privilege.

25

1          MS. SCHMALZ:  It's work -- right.  Attorney work

2     product.

3          THE COURT:  Right.  But you have a work product --

4     the work product doctrine generally protects undisclosed work

5     product by non-testifying expert.  When you retain --

6          MS. SCHMALZ:  Well, they're not --

7          THE COURT:  -- a testifying expert, which is what

8     the McLaren firm now is, the rule changed.

9          MS. SCHMALZ:  Well, this was work product in

10    preparation of their expert report which we have produced.

11    And Your Honor, the fact that I'm now hearing that they're

12    going to bring Shea Thorenson in here --

13         THE COURT:  What's his first name? Jay?  J-A-Y?

14         MS. SCHMALZ:  Shea, S-H-E-A.

15         THE COURT:  S-H-E-A.  Thank you.

16         MS. SCHMALZ:  If they're going to bring Shea

17    Thorenson in here to testify I assume as a fact witness, he is

18    definitely not identified in their initial disclosures.  And

19    he wouldn't have been, Your Honor, because he was working for

20    McLaren Engineering at the time.

21         THE COURT:  When was he let go?

22         MS. SCHMALZ:  I'm sorry?

23         THE COURT:  When was he let go?

24         MS. SCHMALZ:  And I don't know whether he

25    technically resigned or was let go, Your Honor, but he left --

26

 1          THE COURT:  When did he leave the firm?

 2          MS. SCHMALZ:  He left the firm in I want to say --

 3   I'm sorry, Your Honor.  I would have to check with Mr. McLaren

 4   on the exact date when he left the firm.  It was probably

 5   2017, Your Honor.  I'd have to check the exact date when he

 6   left the firm.  But he definitely -- I was there, Your Honor,

 7   and I'm 100 percent positive that he was involved in the

 8   initial -- in McLaren's initial inspection of the vessel with

 9   respect to preparing the expert report.  Mr. Thorenson was

10   certainly there.  And I think it's just incredible that

11   they're coming here now stating the fact that he would serve

12   as a fact witness in their -- if we go to trial in this case.

13          THE COURT:  All right.  So let me hear from Mr.

14   Wachtel, first of all, as to why you haven't updated your

15   automatic disclosures or any other relevant discovery

16   responses as required by Rule 26(e) if a new witness has

17   fallen into your lap.  And second, your response to the

18   assertion that it is improper for you to be having ex parte

19   communications with Mr. Thorenson.

20          MR. WACHTEL:  Sure.  First let me clarify what I

21   said earlier.  If we end up getting to what we believe is the

22   truth about these McLaren proposals, that we have absolutely

23   no reason whatsoever to have Mr. Thorvaldsen as a witness.

24          THE COURT:  I don't think that's really the point.

25          MR. WACHTEL:  Okay.

1          THE COURT:  The point is you're treating him as a

2    source so to speak and a potential witness at present and

3    you're talking to him about matters that you may wish to have

4    him testify about, right?

5          MR. WACHTEL:  Matters as to what?

6          THE COURT:  As to which you may call him as a

7    witness.

8          MR. WACHTEL:  Standing here today it is my fervent

9    belief that we will get document paper trails from McLaren and

10    we're also going to have no reason --

11          THE COURT:  Okay.  So Rule 26(a)(1)(A)(I) requires

12    the disclosure of individuals "likely to have discoverable

13    information."  Does he qualify?  Answer, yes.  So you are

14    under a duty to timely update.

15          MR. WACHTEL:  Hang on one second, Your Honor.  The

16    only reason we would be calling him is for impeachment

17    purposes.

18          THE COURT:  Are you deliberately not understanding

19    my question?  Rule 26(a)(1)(I) does not call for a list of

20    trial witnesses.  It calls for a list of individuals with

21    potentially discoverable information.

22          MR. WACHTEL:  Unless the use would be --

23          THE COURT:  Trial witness get disclosed a little

24    later in the game.

25          MR. WACHTEL:  I am not intending to be obtuse.  I do

28

1   see it says unless the use would be solely for impeachment.

2           THE COURT:  Solely, solely for impeachment.

3           MR. WACHTEL:  Mr. Thorvaldsen is not an important

4   witness, or even a prospective witness.  I'll even agree right

5   now we will never call him as a witness.  It's just not that

6   important.  What happened, Your Honor, is that when we were

7   unable to get access to these proposals, proposals that we

8   were aware of going back a number of years, we pressed McLaren

9   for them and ultimately they were produced.

10           THE COURT:  When did you first press McLaren for

11   them?

12           MR. WACHTEL:  When did we ask for them?  When we met

13   three or four months ago.

14           THE COURT:  I'm sorry, when who met three or four

15   months ago?

16           MR. WACHTEL:  We had a settlement --

17           THE COURT:  In the settlement meeting.

18           MR. WACHTEL:  In the settlement discussions.

19           THE COURT:  All right.  But when did you find out

20   about what's now the existence of these 2014 and 2015

21   proposals?

22           MR. WACHTEL:  We got the expert report of McLaren

23   in -- on October -- it's dated October 29, 2018.  And I know

24   that I had -- I made inquiry after that.

25           THE COURT:  Made inquiry of Mr. Thorenson?

29

1          MR. WACHTEL:  Of Mr. Thorvaldsen, yes.

2          THE COURT:  So sometime between October and January

3     you found out that --

4          MR. WACHTEL:  It's my best recollection.

5          THE COURT:  -- that these proposals existed and you

6     started asking about them.

7          MR. WACHTEL:  It's my best recollection, yes, Your

8     Honor.

9          THE COURT:  Okay.  All right.  Is there anything

10    else that anyone wants to tell me?  Otherwise I'm going to

11    give you a ruling.

12         MR. WACHTEL:  You asked me the second -- there was a

13    two-part --

14         THE COURT:  You're right.  I did.

15         MR. WACHTEL:  There was a two-part about --

16         THE COURT:  And the second part of the question was,

17    invited your response to the assertion that it was improper

18    for you to be discussing this case with a witness who was in

19    the employ of the defendant's retained expert at the time the

20    defendant retained the expert.

21         MR. WACHTEL:  When I discussed the matter, it was

22    after Mr. Thorvaldsen had left McLaren.  So --

23         THE COURT:  Did you consider whether Mr. Thorenson

24    was under a fiduciary or comparable duty not to have that

25    conversation with you?  I mean just think about it from the

1  point of view of an attorney preparing a case for trial, which

2  is what you are.  Let's suppose the shoe were on the other

3  foot and your expert, Ms. Greenwell, had a lieutenant or an

4  assistant or somebody who worked in her office came to

5  meetings with you, helped with the preliminary stages of

6  preparing her report.  Then something happened, the

7  relationship deteriorated.  This individual left and you were

8  finding out today that that individual was dishing to Ms.

9  Schmalz or Mr. Bers.

10        MR. WACHTEL:  The simple answer is, Your Honor, I

11  had no notion whatsoever that Mr. Thorvaldsen was in any way

12  shape or form involved with the work --

13        THE COURT:  With this assignment.

14        MR. WACHTEL:  Yeah.  None whatsoever.

15        THE COURT:  Did you ask him?

16        MR. WACHTEL:  My inquiry had to do with something

17  that happened years ago.

18        THE COURT:  Did you ask him whether he was involved

19  in the expert retention?

20        MR. WACHTEL:  I didn't.  As simple as didn't you do

21  a study some time ago or wasn't some study done a while ago?

22  It had nothing to do with this expert report.  Nothing.

23        THE COURT:  All right.  Anything else you want to

24  tell me?

25        MR. WACHTEL:  No.

1       THE COURT:  And defendant?

2       MS. SCHMALZ:  I guess to your earlier question, Your

3  Honor, of whether we should extend out the discovery schedule

4  any further, it is our position that we would like to proceed

5  with the expert discovery, move forward with this case.  We do

6  intend to file a motion for summary judgment in the case.  And

7  I also just want to -- so to answer your question, I don't

8  think any further extension of discovery is warranted beyond

9  where we are now.

10       And finally, I do think that Mr. -- certainly Mr.

11  Wachtel's office was familiar with the fact that, and Mr.

12  Wachtel was familiar with the fact that Mr. Thorenson was

13  involved in this case.  It's my understanding that I believe

14  he may have even been a principal in McLaren Engineering.

15  This wasn't a rank and file employee, Your Honor.  He was a

16  high level employee at McLaren.  He was in charge, I know that

17  he was in charge, as Mr. McLaren testified, he was in charge

18  of all McLaren's maritime engineering operations in terms --

19  so he was a high level employee.  And I think, again, I just

20  think it was improper.

21       THE COURT:  And do you have --

22       MS. SCHMALZ:  And obvious --

23       THE COURT:  -- any proposed redress?  What do you

24  propose that the Court do about that?

25       MS. SCHMALZ:  I propose that the Court prohibit the

32

1    plaintiff from further interaction with Mr. Thorenson.  And in

2    light of the fact that he was privy to all kinds of

3    information as our retained, as part of our retained expert,

4    and also that he not be permitted to testify as a witness in

5    this trial as he was neither identified nor produced.  Again,

6    we had not opportunity and honestly we had no reason to depose

7    him because we believed that he was our expert witness.  You

8    know, as you said, that there was some type of fiduciary

9    responsibility as a high level individual who was on the

10   vessels measuring the gangway, giving advice to Mr. Bers and I

11   and his opinions regarding the vessels.  He was involved in

12   all of that, Your Honor.  So I think that would be the

13   redress.

14            THE COURT:  Well, I think Mr. Wachtel has

15   represented to the Court that the plaintiff does not intend to

16   call Mr. Thorenson.  Did I hear that correctly?

17            MR. WACHTEL:  That's correct, Your Honor.

18            MS. SCHMALZ:  Okay.

19            THE COURT:  All right.  So he will not be a trial

20   witness either in person or through any other form of recorded

21   testimony.  All right.  You may both be seated.

22            My decision is as follows.  The two McLaren

23   proposals, or two iterations of the McLaren proposal, however

24   you want to describe them, dated 2014 and 2015 which were

25   brought to my attention as Exhibit D to the plaintiff's

1   February 15th letter are within the scope of plaintiff's

2   document demand number 14.  Consequently, they should have

3   been produced last year.  However, the prejudice which does

4   not appear to me to be earthshaking here can be cured by

5   measures substantially short of terminating sanctions.  And

6   the redress will be as follows.  The defendant shall produce

7   all communications between its firm between the defendant

8   entities and the McLaren entities with regard to the proposals

9   and/or the work discussed within the proposals.  In addition,

10  the defendant shall obtain from the McLaren firm the McLaren

11  end of those communications to the extent necessary as well as

12  the McLaren work product with regard to those two proposals

13  including whatever file or files McLaren kept with regard to

14  those proposals and any photographs or other preliminary work

15  done with regard to those proposals.  And those documents will

16  be produced within two weeks of today which is to say March

17  the 19th.

18          In addition, the plaintiff may take the deposition

19  of Mr. Silechia [Ph.] limited to half a day which is to say

20  three and a half hours of testimony and that deposition is to

21  take place no later than the end of March.  I see that the

22  last business day of March is March 29th.  So that gives you a

23  week and a half after the documents are produced but I

24  recommend that you schedule the deposition now so that you

25  don't run out of time after you see the documents.  There will

1  be no change to the remainder of the existing expert discovery

2  schedule which as I understand it calls for the remaining two

3  expert depositions to take place on March the 6th and March the

4  12th.  Because there has been some misconduct on both sides

5  with regard to, for example, unilaterally scheduling

6  depositions outside of the Court's end date without advising

7  the Court in advance, I will not issue monetary sanctions in

8  connection with this matter.  I will direct the plaintiff to

9  update his automatic disclosures pursuant to Rule 26(e) and to

10  update any other discovery responses it may have provided in

11  the past.  I don't know if there are any that would be

12  triggered by this, but to the extent it was asked, for

13  example, for the identity of witnesses or potential witnesses,

14  those will need to be updated as well under Rule 26(e) to

15  include the necessary information regarding Mr. Thorenson.  I

16  except the plaintiff's representation and will incorporate it

17  into the Court's order that Mr. Thorenson will not in fact be

18  called as a witness to testify at trial.  If the defendant

19  believes there is grounds for any additional court orders with

20  regard to Mr. Thorenson, the defendant may make a motion in

21  that regard and your motion date will also be two weeks from

22  today.  Any motion that you wish to make with regard to Mr.

23  Thorenson you will make by March the 19th.

24          Have I left any loose ends, plaintiff?

25          MS. SPIEGELMAN:  Your Honor, I'd just like to point

35

1  out that the two proposals are addressed to Mr. Silechia at

2  his Hornblower address, so we'd request that the defendant

3  provide communications between McLaren and the defendant

4  Statute Cruises as well as its parent company Hornblower.

5      THE COURT:  I accept your clarification.  So the

6  communications should include not just those which technically

7  went to Statute Cruises, but also any affiliate entities that

8  were involved in those communications.

9      MS. SCHMALZ:  Related to the proposals, correct.

10      THE COURT:  Within the scope of my order.

11      MS. SCHMALZ:  Yes.

12      THE COURT:  All right.  Anything else?

13      MR. WACHTEL:  No, Your Honor.

14      THE COURT:  Defendants?

15      MS. SCHMALZ:  No, Your Honor.

16      THE COURT:  All right.  That will be the order of

17  the Court.  We'll get it out to you hopefully later today

18  without reasoning but just the top line order.  Thank you very

19  much.

20      MS. SPIEGELMAN:  Thank you, Your Honor.

21      MS. SCHMALZ:  Thank you, Your Honor.

22      MR. WACHTEL:  Thank you.

23          * * * * * *

24

25

36

1      I certify that the foregoing is a court transcript from

2  an electronic sound recording of the proceedings in the above-

3  entitled matter.

4

5                                    _Mary Greco_____

6                                         Mary Greco

7  Dated:   February 26, 2020